# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CATHERINE FISCHER, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br> v.<br><br>PAREXEL INTERNATIONAL CORPORATION, A. DANA CALLOW, JR., PATRICK J. FORTUNE, MAYKIN HO, EDUARD E. HOLDENER, CHRISTOPHER J. LINDOP, RICHARD J. LOVE, JOSEF H. VON RICKENBACH, and ELLEN M. ZANE,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Catherine Fischer ("Plaintiff"), by her undersigned counsel, alleges upon personal knowledge as to herself and upon information and belief, based upon, among other things, her counsel's investigation, as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1. This is a shareholder class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, brought by Plaintiff, on behalf of herself and holders of the common stock of PAREXEL International Corporation ("PAREXEL" or the "Company"), against PAREXEL and PAREXEL's Board of Directors (the "Individual Defendants" or the "Board"), for their ongoing violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and rules and regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed acquisition of PAREXEL by Pamplona Capital Management, LLP (together with its subsidiaries and affiliates, including without limitation Parent and Merger Sub, as hereinafter defined, "Pamplona").

2.     PAREXEL describes itself as a leading biopharmaceutical outsourcing services company, providing a broad range of expertise in clinical research, clinical logistics, medical communications, consulting, commercialization and advanced technology products and services to the worldwide pharmaceutical, biotechnology, and medical device industries. It has offices in 86 locations in 51 countries around the world. According to the Company's most recent Form 10-K (for the fiscal year ended June 30, 2016):

> Our primary objective is to provide quality solutions for managing the biopharmaceutical product lifecycle with the goal of reducing the time, risk, and cost associated with the development and commercialization of new therapies. Since our incorporation in 1983, we have developed significant expertise in processes and technologies supporting this strategy. Our product and service offerings include: clinical trials management, observational studies and patient/disease registries, data management, biostatistical analysis, epidemiology, health economics/outcomes research, pharmacovigilance, medical communications, clinical pharmacology, patient recruitment, clinical supply and drug logistics, post-marketing surveillance, regulatory and product development and commercialization consulting, health policy and reimbursement and market access consulting, medical imaging services, regulatory information management ("RIM") solutions, ClinPhone randomization and trial supply management services ("RTSM"), electronic data capture systems ("EDC"), clinical trial management systems ("CTMS"), web-based portals, systems integration, patient diary applications, and other product development tools and services. We believe that our comprehensive services, depth of therapeutic area expertise, global footprint and related access to patients, and sophisticated information technology, along with our experience in global drug development and product launch services, represent key competitive strengths.

3.     On June 20, 2017, PAREXEL and Pamplona jointly announced they had entered into a definitive agreement under which Pamplona will acquire all of the outstanding shares of PAREXEL for $88.10 per share in cash (the "Proposed Transaction"). Upon completion of the Proposed Transaction, PAREXEL will become a privately-held company and its common stock will no longer be listed on any public market. According to the joint press release, the Proposed Transaction is valued at approximately $5.0 billion, including PAREXEL's net debt. The Proposed Transaction is subject, among other things, to the approval of a majority of PAREXEL

shareholders. According to Defendants, the deal is expected to close early in the fourth quarter of 2017.

4.     The June 20, 2017 joint press release issued by PAREXEL and Pamplona stated:

BOSTON and NEW YORK, June 20, 2017 – PAREXEL International Corporation (NASDAQ: PRXL), a leading global biopharmaceutical services provider, and Pamplona Capital Management, LLP (Pamplona) today announced that they have entered into a definitive agreement under which Pamplona will acquire all of the outstanding shares of PAREXEL for $88.10 per share in cash in a transaction valued at approximately $5.0 billion, including PAREXEL's net debt.

The purchase price represents a 27.9% premium to PAREXEL's unaffected closing stock price on May 5, 2017, the last trading day prior to published market speculation regarding a potential transaction involving the Company; a 38.5% premium to the unaffected 30-day volume weighted average closing share price of PAREXEL's common stock ended May 5, 2017; and a 23.3% premium to the Company's undisturbed 52-week high.

"Today's announcement is the culmination of a comprehensive review of the opportunities available to the Company, including interest solicited and received from multiple parties with the assistance of independent financial and legal advisors. Having considered these opportunities, the PAREXEL Board of Directors unanimously determined that this all-cash transaction and the significant, certain value it provides is in the best interest of PAREXEL shareholders, as well as our company," said Josef von Rickenbach, Chairman and Chief Executive Officer of PAREXEL. "PAREXEL benefits from a strong operating foundation with expertise and resources to support our clients in their clinical trials around the world. However, as our results over the past year show, the market for biopharmaceutical services is evolving. We believe the more flexible corporate structure afforded by this transaction will better position us to advance PAREXEL's strategy in light of these realities and to shape the Company to best capitalize on our exciting market opportunities."

Mr. von Rickenbach continued, "Pamplona has significant experience in the pharmaceutical and healthcare industries, and we are pleased to have their support as we work to realize the long-term opportunity for PAREXEL. This transaction and the meaningful value it delivers for our shareholders is a testament to the 19,600 employees who help our clients advance the development and commercialization of new medical therapies worldwide, and we will remain focused on providing our clients with the service and support that have long set PAREXEL apart."

Jeremy Gelber, M.D., Partner at Pamplona, said, "We have great respect for the global leadership that Josef and the talented employees at PAREXEL have built. We are excited to partner with a company and a team that have a strong track record in helping to successfully navigate the complexities innate to the biopharmaceutical industry and bring new therapies to market."

The transaction is not subject to a financing condition. Bank of America Merrill Lynch and J.P. Morgan Chase Bank, N.A. have provided committed financing for the transaction.

The transaction is expected to close early in the fourth quarter of 2017, subject to the approval of a majority of PAREXEL shareholders and the satisfaction of other customary closing conditions.

PAREXEL expects to hold a Special Meeting of Shareholders to consider and vote on the proposed agreement with Pamplona as soon as practicable after the mailing of the proxy statement to shareholders.

The PAREXEL Board of Directors unanimously approved the transaction and intends to recommend that all PAREXEL shareholders vote to approve the agreement with Pamplona.

Upon the completion of the transaction, PAREXEL will become a privately held company and shares of PAREXEL's common stock will no longer be listed on any public market.

Goldman Sachs & Co. LLC is acting as financial advisor to PAREXEL, and Goodwin Procter LLP is serving as legal counsel.

Perella Weinberg Partners LP is acting as financial advisor to Pamplona, and Kirkland & Ellis LLP is serving as legal counsel.

5.      To induce PAREXEL stockholders, including Plaintiff, to vote in favor of the Proposed Transaction, on July 14, 2017, Defendants filed, or caused to be filed, with the U.S. Securities and Exchange Commission (the "SEC"), a materially false and misleading preliminary proxy statement (the "Proxy") on Schedule 14A in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.      Among other things, the Proxy contains the unanimous recommendation of the Board that PAREXEL shareholders vote "for" the Proposed Transaction. However, as detailed

herein, the Proxy misrepresents and omits material information concerning, among other things: (a) the background and process that led to the Proposed Transaction; (b) PAREXEL's management's financial projections; (c) conflicts of interest affecting the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), on whose fairness opinion the Board relied; (d) conflicts of interest affecting the Board's ability to exercise independent judgment; and (e) possible alternatives to the Proposed Transaction. Without such material information, Plaintiff and other PAREXEL shareholders, upon whose approval the Proposed Transaction is conditioned, are not able to assess the integrity of the process that led to the Proposed Transaction or the adequacy of the consideration being offered for their shares.

7.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

### JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

9.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1391(b) because Defendants systematically transact business on a regular basis in this District and/or reside in this District, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Defendant PAREXEL is a Massachusetts corporation headquartered in this District.

## PARTIES

11.     Plaintiff is, and was at all times relevant hereto, a continuous stockholder of PAREXEL.

12.     Defendant PAREXEL is a Massachusetts corporation, with its principal place of business at 195 West Street, Waltham, Massachusetts. As of May 3, 2017, PAREXEL had 50,762,287 shares of common stock outstanding, which are traded on NASDAQ under the symbol "PRXL."

13.     Defendant Josef H. von Rickenbach founded PAREXEL in 1983 and has served as a Director, Chairman of the Board, and Chief Executive Officer ("CEO") since 1983 and served as President from 1983 until April 2001.

14.     Defendant A. Dana Callow, Jr., was elected as Director of the Company in June 1986 and is the Presiding Director of the Board.

15.     Defendant Patrick J. Fortune was elected as Director of the Company in June 1996.

16.     Defendant Maykin Ho was elected as Director of the Company in August 2015.

17.     Defendant Eduard E. Holdener was elected as Director of the Company in January 2008.

18.     Defendant Christopher J. Lindop was elected as Director of the Company in October 2006.

19.     Defendant Richard J. Love was elected as Director of the Company in September 2002.

20.     Defendant Ellen M. Zane was elected as Director of the Company in July 2006.

21.     Defendants von Rickenbach, Callow, Fortune, Ho, Holdener, Lindop, Love, and Zane are referred to herein collectively as the "Board" or the "Individual Defendants." The Individual Defendants and PAREXEL are referred to as "Defendants."

22.     Non-party Pamplona is a London, New York, and Boston-based, privately-owned specialist investment manager that provides an alternative investment platform across private equity, and single-manager hedge fund investments. Pamplona manages over $10 billion in assets across a number of funds for a variety of clients including public pension funds, international wealth managers, multinational corporations, family offices, and funds of hedge funds. According to the joint June 20, 2017 press release referred to above, "Pamplona invests long-term capital across the capital structure of its portfolio companies in both public and private market situations and has been one of the most active private equity investors in healthcare in recent years."

23.     Non-party West Street Parent, LLC ("Parent"), a Delaware limited liability company, was formed on June 19, 2017 by an affiliate of Pamplona solely for the purpose of entering into the Merger Agreement and related agreements and completing the merger and other transactions contemplated by the Merger Agreement. Parent has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and the related agreements. Upon completion of the merger, PAREXEL will be a subsidiary of Parent.

24.     Non-party West Street Merger Sub, Inc. ("Merger Sub"), a Massachusetts corporation and a wholly-owned subsidiary of Parent, was formed on June 19, 2017 by an affiliate of Pamplona solely for the purpose of engaging in the transactions contemplated by the Merger Agreement. Merger Sub has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and the related

agreements. At the effective time of the merger, Merger Sub will merge with and into PAREXEL, and the separate existence of Merger Sub will cease and PAREXEL will be the surviving entity in the merger.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of PAREXEL common stock entitled to vote whether to approve the Proposed Transaction (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, affiliated with, or controlled by any of the Defendants.

26.     The members of the Class are so numerous that joinder of all members is impracticable. As of May 3, 2017, PAREXEL had 50,762,287 shares of common stock outstanding, which are actively traded on NASDAQ under the symbol "PRXL." Although the exact number of Class members is not known to Plaintiff at this time, Plaintiff believes there are at least hundreds, if not thousands, of members of the proposed Class. Members of the Class can be identified from records maintained by PAREXEL or its transfer agent, and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in other actions of this nature.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly damaged by Defendants' misconduct as complained of herein. Plaintiff does not have any interests that are in conflict with the interests of the Class.

28.     Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in litigation of this nature.

29.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact are:

    a)  Whether the Proxy misstates or omits material information with respect to the Proposed Transaction;

    b)  Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in connection with the Proposed Transaction;

    c)  Whether the Individual Defendants are liable under Section 20(a) of the Exchange Act; and

    d)  Whether Plaintiff and other members of the Class will suffer irreparable injury if the Proposed Transaction is consummated.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action.

31.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual Class members as, a practical matter, would be dispositive of the interests of the other members of the Class not parties to the individual adjudications.

32.     Defendants have acted on grounds that apply generally to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DEFENDANTS' WRONGDOING

### *The Defective Sales Process*

33.     The process pursuant to which the Board caused PAREXEL to enter into a definitive agreement to be acquired by Pamplona – the Agreement and Plan of Merger by and among PAREXEL, Parent, and Merger Sub, dated June 19, 2017 (the "Merger Agreement") – was defective and tainted. Defendants are soliciting shareholder approval for the Proposed Transaction by means of a Proxy with materially misleading and inadequate disclosures. As a result, Plaintiff and the Company's other public shareholders are not able to rely on the integrity of the process that led to the Proposed Transaction or properly evaluate the adequacy of the consideration being offered for their shares.

34.     And, to the detriment of the Company's shareholders, the terms of the Merger Agreement substantively favor Pamplona and are calculated to dissuade other potential suitors from making a competing offer.

35.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits them from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.

36.     According to the Proxy (at pages 81-82), PAREXEL is required not to, and to cause its subsidiaries and its and their respective representatives not to, directly or indirectly (other than with respect to Parent and Merger Sub):

- solicit, initiate, knowingly facilitate or knowingly encourage (including by way of providing information) any inquiries, proposals or offers that constitute, or that could reasonably be expected to lead to, an acquisition proposal;

- knowingly engage in, continue or otherwise participate in any discussions or negotiations with any third party regarding an acquisition proposal or any inquiries, proposals or offers that could reasonably be expected to lead to an acquisition proposal, or furnish to any third party information or provide to any third party access to the businesses, properties, assets or personnel of PAREXEL or any of our subsidiaries, in each case in connection with or for the purpose of encouraging or facilitating an acquisition proposal or any inquiries, proposals or offers that could reasonably be expected to lead to an acquisition proposal;

- approve, endorse or enter into any letter of intent, agreement, commitment or agreement in principle (other than a customary confidentiality agreement satisfying certain conditions entered into in accordance with the terms of the Merger Agreement) or other arrangement with respect to an acquisition proposal or enter into any agreement or commitment or other arrangement requiring PAREXEL to abandon, terminate, breach or fail to consummate the transactions contemplated by the Merger Agreement; or

- resolve or agree to do any of the foregoing.

37.    PAREXEL is further required to, and to cause its subsidiaries and its and their respective representatives to, "immediately cease and terminate" any existing solicitations, encouragements, discussions or negotiations with any third party theretofore conducted by PAREXEL, its subsidiaries or its or their respective representatives with respect to an acquisition proposal. In addition, PAREXEL is required to promptly (and in any event within 24 hours of the date of the Merger Agreement) request the return or destruction of all non-public information previously provided by or on behalf of PAREXEL or any of its subsidiaries to such third party, and to use commercially reasonable efforts to cause such return or destruction. (Proxy at 82.)

38.    Further, PAREXEL must notify Pamplona "as promptly as practicable," i.e. within 24 hours, following PAREXEL's receipt of any acquisition proposal, or any inquiries, proposals, or offers that could reasonably be expected to lead to an acquisition proposal, or of any requests for information or access to the business, properties, assets, or personnel of PAREXEL or any of our subsidiaries, in each case in connection with an acquisition proposal or any inquiry, proposal, or offer that could reasonably be expected to lead to an acquisition proposal. PAREXEL must thereafter keep Pamplona reasonably informed on a reasonably

current basis (and in any event within 24 hours) of the status of any material developments, discussions, or negotiations regarding any such acquisition proposal or other inquiry, proposal, or offer, and the material terms and conditions thereof, including by providing a copy of material documentation setting forth or related to the material terms of such acquisition proposal or other inquiry, proposal, or offer that is exchanged with the third party (or its representatives) making such acquisition proposal and PAREXEL or its subsidiaries (or their respective representatives) within 24 hours after exchange thereof. (Proxy at 82-83.)

39.     In addition, the Merger Agreement contains a highly restrictive "fiduciary out" provision that permits the Board to withdraw its approval of the Proposed Transaction only under extremely limited circumstances; requires PAREXEL to give Pamplona at least three business days' prior written notice of its intention to take such action and specifying the reasons for taking such action (and two business days' notice of any amendment to the financial terms or any other material terms of such superior proposal); requires PAREXEL to advise Pamplona of the material terms and conditions of, and the identity of the third party making, a "superior proposal" and to provide copies of any relevant transaction documents; and grants Pamplona a right to renegotiate the terms of the Proposed Transaction to match any "superior proposal." (Proxy at 84.)

40.     Moreover, as a result of the provision in the Merger Agreement prohibiting PAREXEL from "participat[ing] in *any* discussions or negotiations with any third party regarding an acquisition proposal or any inquiries, proposals or offers that could reasonably be expected to lead to an acquisition proposal," the Individual Defendants cannot possibly explore any potentially superior unsolicited proposals and therefore the "fiduciary out" is illusory.

41.     Further locking up control of the Company in favor of Pamplona, PAREXEL is required to pay Pamplona a termination fee: (i) if Pamplona terminates the Merger Agreement

because the Board has made an adverse recommendation change; (ii) if PAREXEL terminates

the Merger Agreement in order to enter into an alternative acquisition agreement providing for a

"superior proposal"; or (iii) (1) if either party terminates because of a failed shareholder vote, or

if Pamplona terminates because of a Company breach, (2) prior to the shareholder meeting an

acquisition proposal will have been made directly to PAREXEL's shareholders or will have been

otherwise publicly disclosed and, in each case, not withdrawn before the receipt of the approval

of PAREXEL's shareholders and (3) within 12 months after the date the Merger Agreement is

terminated, PAREXEL consummates or enters into a definitive agreement providing for a

transaction that constitutes an acquisition proposal (whether or not such acquisition proposal is

the same acquisition proposal described in (2) above), which is subsequently consummated. The

termination fee payable by PAREXEL in any of the foregoing circumstances is $138 million

(representing approximately 3.0% of PAREXEL's equity value based on the merger

consideration). (Proxy at 93-94.)

42.    Further, regardless of the amount of damages actually suffered by PAREXEL, in

the event Pamplona breaches the Merger Agreement, PAREXEL is not, "under any

circumstances," entitled to monetary damages from Pamplona in excess of $276 million (plus

reimbursement of certain costs and expenses). (Proxy at 94.)

43.    By agreeing to these deal protection devices, the Individual Defendants have

improperly locked up the Proposed Transaction and have effectively precluded any bidder other

than Pamplona from making a successful competing offer for the Company.

### *The Proxy Omits Material Information, Rendering It False and Misleading*

44.    The Proxy, which Defendants filed, or caused to be filed, with the SEC on July

14, 2017, misrepresents and omits material information concerning the Proposed Transaction

and, therefore, is materially false and misleading. Without such information, PAREXEL

shareholders are not able to render an informed decision with respect to the Proposed Transaction.

45.    First, the Proxy omits material information with respect to the Company's financial projections and the financial analyses performed by the Company's financial advisor, Goldman Sachs.

46.    With respect to the *Company Projections*, the Proxy fails to provide a reconciliation of all non-GAAP to GAAP metrics for the years 2017 through 2022. When a company discloses information that includes a non-GAAP financial measure, as PAREXEL does in the Proxy, it also must present: (1) "the most directly comparable financial measure calculated and presented in accordance with Generally Accepted Accounting Principles (GAAP)" and (2) "[a] reconciliation (by schedule or other clearly understandable method), which shall be quantitative for historical non-GAAP measures presented, and quantitative, to the extent available without unreasonable efforts, for forward-looking information, of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP . . . ." 17 C.F.R. §244.100(a) (Regulation G).

47.    In addition, a registrant, such as PAREXEL, "shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it was presented, not misleading." 17 C.F.R. §244.100(b).

48.    Former SEC Chair Mary Jo White has cautioned with respect to the frequent use by publicly-traded companies of unique company-specific non-GAAP financial measures: "In

too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation."

49.     As recently as May 3, 2017, in its public press release reporting third quarter fiscal year 2017 results, the Company provided the following information with respect to the reconciliation of non-GAAP metrics: (a) the impact of net adjustments for acquisition and integration related charges in the PC segment; (b) the impact of net adjustments for a charge related to a fully impaired internally developed software, and charges related to acquisition and integration related charges, including the revaluation of earn-out contingent consideration liability associated with certain acquisitions; (c) the severance, facility costs, and changes in estimates related to the restructuring programs; (d) a fair value adjustment loss of $0.4 million in connection with an accelerated share repurchase program; (e) the tax effect on non-GAAP adjustments; and (f) the impact of net adjustments for acquisition and integration related charges, including the revaluation of earn-out contingent consideration liability associated with certain acquisitions. Defendants, themselves, caution that the non-GAAP figures in the Proxy "should not be considered in isolation from, or as a substitute for, financial information presented in accordance with GAAP." (Proxy at 57.) Yet, notwithstanding, among other things, the requirements of Regulation G and the numerous adjustments necessary to reconcile the non-GAAP measures presented in the Proxy, the Proxy fails to provide an appropriate reconciliation of the non-GAAP measures.

50.     Moreover, irrespective of Regulation G, the projections as disclosed in the Proxy are materially misleading without the requisite GAAP reconciliations and explanatory notes. For example, the projections imply varying amounts of PAREXEL shares being repurchased during each of the years in the projection period and also project that unlevered free cash flow will grow

throughout the period. This indicates that PAREXEL management assumed either (i) a varying share price; or (ii) varying interest payments (for the "leverage" in the levered cash flow). Nevertheless, the Proxy fails to disclose the actual assumptions and the bases underlying these projections.

51.     The Proxy also fails to disclose PAREXEL's projected **levered** cash-flow for 2017-2022 despite the significance of that metric for calculating the projected earnings per share ("EPS") for each of the years in the projection period and determining the number of shares projected to be bought back during the period. (*See* Proxy at 58 n.5.)

52.     In addition, the projections imply disparate growth in projected net income compared to EPS.  This indicates projected value creation as a result of the share buyback, further highlighting the materiality of the assumptions underlying the share buyback.

53.     Because the financial analyses prepared by Goldman Sachs and presented in the Proxy, including without limitation Goldman Sachs' *Implied Premia and Multiple Analysis*, *Illustrative Discounted Cash Flow Analyses*, and *Illustrative Present Value of Future Share Price Analyses*, rely explicitly upon the Company's Projections, they too are materially deceptive. Significantly, according to the Proxy, Goldman Sachs relied upon the Company Projections "without assuming any responsibility for independent verification thereof." (Proxy at 49.)

54.     Second, the Proxy omits material information concerning potential conflicts of interest affecting the Company's financial advisor, Goldman Sachs, upon whose opinion that the Proposed Transaction is fair from a financial point of view to PAREXEL's shareholders the Board relied. According to the Proxy, Goldman Sachs and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, "may at any time purchase, sell, hold or vote long or short positions and

investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of the Company, Parent, any of their respective affiliates and third parties, including Pamplona and its affiliates and their respective portfolio companies . . . ." (Proxy at 55.) The Proxy fails to disclose, however, whether Goldman Sachs or its affiliates are holding long or short positions in securities or financial instruments of the Company or Pamplona for the account of any customers and, if so, the securities or financial instruments held and the extent of such holdings.

55.    The Proxy also states:

> Goldman Sachs has provided certain financial advisory and/or underwriting services to Pamplona, its affiliates and/or their respective portfolio companies from time to time for which its Investment Banking Division has received, and may receive, compensation, including having acted as a co-lead arranger and as a joint bookrunner with respect to a senior secured term loan (aggregate principal amount $700,000,000) with respect to Alvogen Pharma US Inc., a portfolio company of Pamplona, in September 2015; as a joint bookrunner with respect to a senior secured loan (aggregate principal amount $717,000,000) to Omnium de Gestion et de Financement S.A. ("OGF"), a portfolio company of Pamplona, in November 2016; and as financial advisor to Pamplona with respect to the sale by an affiliate of Pamplona of such affiliate's holdings in OGF in April 2017. During the two year period ended June 19, 2017, Goldman Sachs has received compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Pamplona, its affiliates and/or their respective portfolio companies of approximately $6.0 million. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to the Company, Parent and their respective affiliates and to Pamplona, its affiliates and their respective portfolio companies for which its Investment Banking Division may receive compensation. Affiliates of Goldman Sachs also may have co-invested with Pamplona and its affiliates from time to time and may have invested in limited partnership units of affiliates of Pamplona from time to time and may do so in the future.

*Id.*

56.    While disclosing certain facts that give rise to serious concerns about possible conflicts of interest tainting Goldman Sachs' ability to provide independent judgment, the Proxy

fails to disclose at least the following additional transactions on which Goldman Sachs worked closely with Pamplona since 2014:

- In 2016, Goldman Sachs and Pamplona committed approximately $2.4 billion of the $5.5 billion needed by Bass Pro Shops to acquire Cabela's Incorporated.

- In November 2015, MedAssets, Inc. ("MedAssets") and Pamplona announced they had entered into a definitive agreement whereby Pamplona would acquire MedAssets for $31.35 per share in cash. Goldman Sachs and Deutsche Bank Securities Inc., acted as MedAsset's financial advisors.

- In September 2014, Privia Health ("Privia"), a Virginia-based physician practice management and population health technology company, announced that an investor group led by an affiliate of Goldman Sachs, together with other investors including Pamplona, was funding Privia's national expansion, pursuant to which it aligned with other complementary portfolio companies within the Stamford, Connecticut based holding company, Brighton Health Group.

- In January 2014, H.I.G. Capital, LLC ("H.I.G."), a leading global private equity investment firm, announced it had completed the sale of its portfolio company MagnaCare Holdings, Inc. ("MagnaCare") to an investor group led by an affiliate of Goldman Sachs, Pamplona, and the MagnaCare management team.

57.     In addition, Defendant Ho, who joined PAREXEL's Board just two years ago, is a retired partner of Goldman Sachs where she served most recently as an advisory director of Global Healthcare Investment Banking. Defendant Ho joined Goldman Sachs in 1992, and was named managing director in 1998 and partner in 2002. She left Goldman Sachs, after more than

twenty years and more than twelve years as a partner, in June 2015. She joined PAREXEL's Board in August 2015, within two months of leaving Goldman Sachs.

58.     The Proxy states that the Company has agreed to pay Goldman Sachs for its services in connection with the Proposed Transaction an aggregate fee "currently estimated to be approximately $37 million, $5 million of which has been paid to Goldman Sachs upon announcement of the proposed transaction and ***the remainder of which is contingent upon consummation of the proposed transaction***." (Proxy at 55; emphasis added.) Thus, the financial advisor on which the Board has relied to provide an independent evaluation of the transaction and to opine as to the fairness of the merger consideration to the holders of PAREXEL common stock has a very direct and substantial financial stake in the completion of the Proposed Transaction.

59.     The Proxy fails to disclose what measures, if any, the Board took to assure itself that Goldman Sachs' conflicts of interest did not affect its fairness opinion, on which the Board relied, or otherwise taint the process that led to the Proposed Transaction.

60.     In fact, according to the Proxy, from the outset, Goldman Sachs guided the process of identifying a potential buyer of the Company towards "a limited number of financial sponsors" that included Pamplona – with which Goldman Sachs had an established relationship – and away from possible strategic partners. (Proxy at 31.) According to the Proxy, Goldman Sachs advised the Board not to pursue a possible acquisition of the Company by a strategic party purportedly because of "customer overlap and negative synergy." *Id.* The Proxy fails to provide material information with respect to the basis for that determination.  In particular, the Proxy fails to explain how, categorically, and without consideration of the subjective circumstances of specific potential strategic buyers, Goldman Sachs determined, and the Board accepted, that

potential strategic partners would not be able to provide better consideration to PAREXEL shareholders.

61.    Tellingly, and belying this baseless assumption, not only did Goldman Sachs' *Selected Precedent Transaction Analysis* limit its consideration to just **seven** transactions (spanning over **seven years**), a number of the precedent transactions included strategic partners/buyers. Moreover, a cursory review of the relevant proxies in the precedent transactions reveal that for company's like PAREXEL, synergies generally comprise a significant component of the target's value to strategic acquirors.

62.    For example, in the Laboratory Corporation of America Holdings ("LabCorp") and Covance Inc. ("Covance") merger, (a transaction where Goldman Sachs advised the target and one of the few precedent transactions analyzed), the value inherent in the potential synergies featured prominently in the negotiations leading up to the LabCorp/Covance transaction and in the valuation analyses utilized to demonstrate the purported fairness of the consideration offered therein. *See generally*, Covance Inc., Schedule 14A (Definitive Proxy), filed January 16, 2015.[1, 2]

---

[1] Available at: https://www.sec.gov/Archives/edgar/data/1023131/000119312515013241/d853580ddefm14a.htm#toc827446_57 (last accessed July 24, 2017).

[2] *See also*, Covance Inc., Form 8-K, at EX-99.1, filed November 4, 2014, attaching press release announcing proposed transaction, dated November 3, 2014, available at: https://www.sec.gov/Archives/edgar/data/1023131/000095015714001192/0000950157-14-001192-index.htm ("LabCorp expects to achieve annual cost synergies in excess of $100 million to be fully realized within three years of closing.") (last accessed July 24, 2017).

Similarly, in the INC Research Holdings, Inc. and inVentiv Health, Inc. May 10, 2017 press release announcing their proposed merger, the press release highlights that: "Transaction Estimated to Realize Approximately $100 Million in Annual Run-Rate Cost Synergies." *See id.*, available at: http://www.inventivhealth.com/our-ideas/press/2017/inventiv-health-and-inc-research-to-merge (last accessed July 24, 2017).

63.     The Board finally considered potentially interested strategic buyers only after *The Wall Street Journal* reported on May 8, 2017 that the Company was exploring strategic alternatives and then, in light of that news story, the Board received "unsolicited" correspondence from two potentially interested strategic parties. (Proxy at 35-36.) Indeed, that two strategic parties ("Strategic 2," and "Strategic 3") ultimately made the most competitive bids (other than Pamplona's) reveals that the determination not to pursue a strategic buyer lacked a reasonable basis and was calculated only to steer the process towards a buyer  with which Goldman Sachs has a substantial relationship (i.e., Pamplona).

64.     Strategic 2 and Strategic 3 consistently outbid Pamplona. Yet, on June 17, 2017, after Strategic 3 again outbid Pamplona, representatives of Goldman Sachs conferred with Pamplona which then "indicated that [it] would be willing to increase its offer price to $88.00 per share or more," essentially granting Pamplona matching rights beyond other genuine bidders. On the day PAREXEL was purportedly about to close a deal with Strategic 3, Pamplona counter-offered and, with the advice of Goldman Sachs, PAREXEL finalized a last-minute deal with Pamplona without any further negotiations with Strategic 3. Now that the Merger Agreement has been executed, the termination fee of $138 million and other deal protection devices referenced above create new barriers to entry for any of the other strategic parties that may otherwise been willing to outbid Pamplona.

65.     Third, the Proxy misrepresents and omits material information concerning possible conflicts of interest affecting the Individual Defendants. Thus, the Proxy states that, as of the date of the Proxy, "none of PAREXEL, Parent or Merger Sub has entered into any employment agreements with PAREXEL's executive officers in connection with the merger." (Proxy at 67.) Yet, in an e-mail to Company employees dated June 20, 2017 – more than three weeks before the Proxy was issued – Defendant von Rickenbach, the founder, Chairman of the

Board, and CEO of the Company, stated: "The Company will continue to be led by our current management team and will operate much as it does today." The Proxy fails to disclose any information concerning when it was determined that the Company will continue to be led by its current management team, which is headed by Defendant von Rickenbach. In addition, as noted above, as a former partner of Goldman Sachs, Defendant Ho is in a potentially conflicted position.

66.    Fourth, the Proxy omits material information concerning possible strategic alternatives to the Proposed Transaction.

67.    Thus, while purporting to summarize the material aspects of the process that led to the Proposed Transaction, the Proxy fails to disclose material information with respect to why the Board determined not to pursue further negotiations with Strategic 3 after Pamplona made an offer of $88.10 per share – especially given that, in May, Strategic 3 had presented a written preliminary indication of interest proposing a price range of $84.00 to $88.00 per share and an all-cash transaction, without a financing condition (Proxy at 37). The Proxy states only, without further detail or explanation, that "the Board did not believe that Strategic 3 would improve upon its $87.50 offer and that asking again for improvement of this offer would put at risk the ongoing negotiations with Strategic 3 to finalize the terms of the merger agreement." (Proxy at 41-42.) The Proxy, however, fails to explain why the Board was at all concerned to "put at risk the ongoing negotiations with Strategic 3" when Pamplona was making a superior bid.

68.    Fifth, the Proxy refers to Chestnut Securities, which PAREXEL engaged "as a non-exclusive financial advisor to provide supplemental assistance to the independent directors in their evaluation of strategic alternatives." (Proxy at 55.) According to the Proxy, Chestnut Securities "was not asked to, and did not, render to the Company or the Board any opinion as to the fairness of the consideration to be offered to" PAREXEL stockholders. The Company has

agreed to pay Chestnut Securities a fee of $1 million contingent upon consummation of the Proposed Transaction. The Proxy fails to disclose material information with respect to why the Board determined to retain Chestnut Securities in connection with the Proposed Transaction, the precise role of Chestnut Securities, what work Chestnut Securities performed, and whether Defendants retained Chestnut Securities to allay concerns over Goldman Sachs' substantial conflicts.

69.    Based on the foregoing, PAREXEL's stockholders lack critical information necessary to evaluate whether the Proposed Transaction is in their best interests. Moreover, without the key financial information and related disclosures, PAREXEL's stockholders cannot gauge the accuracy and reliability of the financial analyses performed by Goldman Sachs and whether they can reasonably rely on its fairness opinion and the recommendation of the Board, purportedly based thereon.

70.    Accordingly, Plaintiff seeks, among other things: (i) to enjoin the Proposed Transaction; or (ii) to rescind the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLAIMS ALLEGED

## FIRST CAUSE OF ACTION

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

71.    Plaintiff repeats and realleges each allegation set forth herein.

72.    As detailed herein, Defendants disseminated the false and misleading Proxy specified above, which contained statements that, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein

not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

73.    By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations with respect to PAREXEL's common shares.

74.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

75.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

76.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

77.    Plaintiff repeats and realleges each allegation set forth herein.

78.    The Individual Defendants acted as controlling persons of PAREXEL within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of PAREXEL and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false and misleading statements and omissions in the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false and misleading.

79.    Each of the Individual Defendants was provided with, or had access to, copies of the Proxy and other statements alleged by Plaintiff to be materially false and misleading prior to, or shortly after, those statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

80.    In particular, each of the Individual Defendants had, and continues to have, direct and supervisory involvement in the Company's day-to-day operations and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

81.    In addition, as the Proxy sets forth at length and as described herein, each of the Individual Defendants was involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the

Individual Defendants reviewed and considered – descriptions which had input from the Individual Defendants.

82.     By virtue of the foregoing, each of the Individual Defendants has violated Section 20(a) of the Exchange Act.

83.     Plaintiff has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as the Class representative;

B.     Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction unless and until Defendants disclose, completely and accurately, the material information concerning the Proposed Transaction that is now misstated in, or omitted from, the Proxy;

C.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff damages;

D.     Directing the Individual Defendants to account to Plaintiff for all damages suffered as a result of the wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues and in all proceedings so triable.

Dated:  July 25, 2017                          Plaintiff Catherine Fischer,

                                               By her attorneys,


                                               */s/Theodore M. Hess-Mahan*
                                               Theodore M. Hess-Mahan, BBO #557109
                                               Hutchings Barsamian Mandelcorn, LLP
                                               110 Cedar Street, Suite 250
                                               Wellesley Hills, MA 02481
                                               Telephone: 781-207-1717
                                               Facsimile: 781-431-8726
                                               Email: thess-mahan@hutchingsbarsamian.com



**OF COUNSEL:**

**BROWER PIVEN**
  A Professional Corporation
Daniel Kuznicki
475 Park Avenue South, 33rd Floor
New York, New York 10016
Telephone: 212-501-9000
kuznicki@browerpiven.com